Burschhorn You want to reserve five, Mr. Burschhorn? Yes, Your Honor. Okay. You may proceed, Your Honor. Good morning, Your Honors. If we're ready, Philip Burschhorn, Buchanan, Ingersoll, and Rooney, on behalf of Appellant's Ethox Chemicals and James Tanner. In 2009, Ethox and Coca-Cola Company entered into a confidential collaboration, and as part of that, Dr. James Tanner conceived of and provided to Coca-Cola a molecule that they were previously unaware of called PEM, we're going to call it PEM today, as a gas barrier additive to be used in polyester composition. Several months later, unbeknownst to Ethox, unbeknownst to James Tanner, Coca-Cola decided, covertly, to file four patent applications, too domestic, too foreign. And at that point in time, they took control of the invention. Both sides in this case provide conflicting statements of facts. They're directly conflicting. But neither side identifies any errors in the district court's findings of fact. Do you contest any of the district court's factual findings appearing at JA 1 to 4, 20 to 32? Your Honor, I think we're not contesting that because I think the rulings that the judge made were not dependent on those facts. The NDA or the nondisclosure agreement rulings were based on his view that there was an unambiguous interpretation of the agreement, and that's a matter of law, it's not a matter of fact. And with respect to the preemption argument, we did contest that at the time. We contested it in the summary judgment opinions because it was premised on one item, but we have to write opinions and we like to nail things down. So you're not contesting his statement of fact. Well, we're contesting that PEM was, in fact, we have contested that PEM is or is not in the prior art. As a linchpin to the judge's preemption argument, the determination was made at appendix page 10 that because PEM was in the prior art as a molecule, that was sufficient to bring about preemption. Our argument is no, that's not the case, and the judge subsequently found that, in fact, PEM as a gas barrier additive was not in the prior art. It was not something that was there, and therefore there's an error in that, and it knocks out the linchpin for the preemption determination. What did Dr. Tanner mean when he said probably it will not work? It's self-effacing. He's a chemist just like all chemists, and he knows that things require testing. So he's providing the molecule that he believes is going to be the gas barrier additive. He understood that that was the type of the project that he was working in. He had already worked on a molecule called BPO1 that had been provided by Koch, and so he looked, understood what BPO1 was, what it was supposed to be used for. He came up with something better, something that had changed, and this is really getting at the inventorship arguments, but something that was better and something that was known. So I think when we're looking at our errors of law, we have an error of law associated with the NDA and the purpose and scope of those NDAs, and we have an error related to the preemption, which I've already talked about. When we look at the purpose and scope of the NDAs, it's very clear. There's a single purpose, a single purpose, and that's Coca-Cola's information flowing to Ethox and the other company that was involved at that time. And when you look at that, you understand the subject matter. Let me clarify something just for the record because maybe it was my hearing. You said something that was better and something that was known? I'm not sure I remember saying that exactly. Something that was unknown to Coca-Cola. So you meant unknown. If I said known, it was known to Dr. Tanner who came up with the idea, but it was unknown to Coca-Cola, unknown to Ethox. That's why I asked you that question. Thank you very much. But going back to the NDA, we look at it. It was signed in April 2009. At that point in time, Ethox and Coca-Cola had not sat down. They hadn't broken bread. They hadn't talked about what was going to happen. At that point in time, the only thing that agreement could cover was the one thing that was in the contemplation of the parties, which was a protection being offered for Coca-Cola's information passing through. And they knew what they had. Ethox didn't. They knew it was chemical. That was it. And so when we look at what the judge did, the judge said, well, the scope is very broad and it covers everything, and effectively said that PEM, PEM samples, PEM activities, PEM testing, all of the things that undergird what eventually became part of the patent applications, that that for some reason should be excluded because that's part of the subject matter of this agreement. When we look at the opening provision, it is very clear. It's Coca-Cola. It's its information. Now, they talk about the purpose being to use those disclosures for purposes of maybe considering a commercial relationship, but there are no terms associated with it in any way, shape, or form. And so what the judge has basically done is said, this nondisclosure agreement, which is, that's what it is, it's a nondisclosure agreement, somehow now relates to activities that are going to go beyond that, related to chemical structures, research and development, other things, none of which are contemplated in the parties. And the cases that we've cited at page 44 to 45 of our brief are clear, that if you have something that is not the subject matter in the contemplation of the parties at the time, it cannot be a, you cannot have deemed to have contracted those rights away. And effectively, that's what the judge said. Let me ask you one question. This isn't, I realize that the inventorship issue is on the cross appeal, and I'm not going to get into that. That will come up when the other side presents its side of the case. But you're, at page 34 of your brief, you say, the district court erred by finding an ongoing royalty is preempted. Okay. Yes. What would be the effect of that on that issue? Obviously, we can either reverse or affirm on the inventorship issue. But assuming, just for purposes of argument, there was an affirmance on the inventorship issue, what happens to this point? I think, Your Honor, we still would be seeking unjust enrichment reward, and that's what was the forward-looking royalty on whatever happens with PEM worldwide. Because when we look at what happened, the net effect is Ethos lost control of the technology. And whatever rights it should have had, it doesn't. It has something much more truncated, even if Dr. Tanner is put onto the patent as an inventor, as he should be. So you're saying it wouldn't go away, this issue? It wouldn't go away. The domestic sale. I mean, again. Which takes us back to the purpose of the agreements. Right. And I think that's right. And the purpose of the agreement is. Well, the other side of the district court took the position that the purpose of the agreement was to have your client and Koch engage in activity to see if the two of them could come to a business arrangement. I agree with that, Your Honor. That's the view of the NDA that cost you the case. Because if that's true, if the purpose was to engage in conduct with one another, looking to developing a business relationship, part of that, once your client had identified PEM, and Koch says we'll make some of that and send it to us and have a look at it, see if we're going to develop a real supply relationship. I understand what you're saying, Your Honor, but I think what we look at is we look at what the contract says and does. The contract is related to one thing and one thing only, and that's the confidential information. Well, that's because it was unilateral. This agreement was unilateral and protected Koch and didn't protect you. The second one protected you. And what I would argue, Your Honor, and I think what we've argued in our briefs is that effectively there was a confidential understanding between the parties. And, in fact, it was kept in confidence. And that, when we get back to it, we'll remember. Your argument really is that one is entering into an arrangement to share information with one another to see whether or not you can get to a goal line over here, but a lot of information going back and forth. You're saying someone would have to be insane to unilaterally sign all the agreements that only protected one party's information? Well, I think part of it is also what the understanding of the parties are. And I think when we're going forward into this, we were entitled to, at the district court level, to prove facts to demonstrate that. If only you protected your information in the second year agreement, why didn't you do it in the first one? Excuse me? Your information is protected in the second agreement. It's bilateral. Well, I think that there's a. . . Why wasn't it protected in the first one? The answer is Ethox believed that their information was protected at all times and that they cinched it when they did the second agreement. But when we look at that agreement, that's after the harm being done. It didn't need to be bilateral the second time if they believed in the unilateral agreement protected their interest. Well, I think they believed that there was a confidential communication undertaken with Coca-Cola, that they were working in collaboration, that they were going to do something together, that they were co-inventors eventually when these things came forward. They weren't given that opportunity, and that's really the problem. That's the unjust enrichment issue. And with respect to. . . I would agree that, I mean, on this particular point, the strongest argument for your appeal is that the nature of the NDA was mischaracterized by the district court. I think that's right, Your Honor. The purpose and scope was well beyond. We agree with the district court, and it's a hard case for you. Mr. Hirshhorn, you have to listen a little more carefully and not try to talk over the judge. I apologize for that, Your Honor. I don't know if I answered your last question, though. Well, I just said, I mean, if we disagree with you and we agree with the characterization of the NDA that was the initial one that was given by the district court, it's a hard case for you. I agree that it's a hard case. I don't think it's an unwinning case. Thank you. Thank you. Mr. Gerritsen. Good morning, Your Honors.  10 and 5 as well. Yes, thank you, Your Honor. John Gerritsen of Shook, Hardy & Bacon on behalf of the Coca-Cola Company. In response to some of the comments made by counsel, the agreements are not ambiguous. The language is clear. There's an attempt to sort of get around the language and say that there has been repudiation or that there was an unstated confidentiality obligation in the 2009 agreement that flowed both ways, not only with respect to the Coca-Cola Company's confidential information but also information that Ethox alleges was confidential. But the provisions are clear, they're not ambiguous, and there is no basis to try to go outside of those agreements. Point us to the provisions that you're relying on. You're just talking generalities at the moment. Yes. There is a first that the purpose is not just confidential information. It states explicitly in the introduction that the purpose is to investigate whether to enter into a commercial relationship. There is an integration clause, paragraph 10. This is page 634, appendix 634 of the 2009 agreement. It says that this is the entire agreement in writing. There's no other understandings. You can only modify this in writing. So the parties expressly agree in writing that there is no understanding apart from what's in the agreement. Any other features of the 2009 NDA that you believe support your reading and the district court's reading of the purpose of the contract? Also, there's paragraph 7 at page 633. In fact, also the 2010 agreement has a similar paragraph, 8, at joint appendix page 2055. These provisions preclude payment. It's a little odd to hear that the only purpose of the 2009 agreement What's the text exactly when you say they preclude payment? I didn't remember the word preclude. I don't believe the word preclude is in the paragraphs. That's why I asked. Your adversary has very candidly, and I'm helpful to the court, agreed that the appeal on this issue turns on the characterization of the 2009 NDA. And so when I'm asking you for data points from you to support your argument, I would be grateful, and the court would be benefited, if you quote the exact language rather than characterizing it. Certainly, Your Honor. What page are you on in the appendix? Yes, I'm at appendix page 633. 633, how far down the page? It's paragraph 7, Your Honor. Paragraph 7. Okay. And it says no party will be obligated to A, pay or otherwise provide a benefit to any other party. B, take or refrain from taking any action, except as expressly set forth herein. Or C, disclose any information. That's one paragraph. Another paragraph is at page 634 of the joint appendix. It's paragraph 10 of the agreement. It states, this agreement represents the entire agreement of the parties and supersedes all prior communications, agreements, and understandings between the parties relating to the subject matter hereof. The agreement may not be modified, amended, or waived, except by a written agreement signed by the representatives of the parties signing below. Those are the two provisions you rely on. Those are the primary provisions. Also, the purpose expressly states in the first paragraph of the letter that encompasses this agreement. It's joint appendix page 632. It's about four or five lines down. It says the purpose of these disclosures will be to determine whether our company and your companies may enter into a commercial relationship. And then it gives a capital definition purpose. And also, and then paragraph 12 parenthetically also says Well, doesn't the purpose take on even a little more importance for us in the court with regard to construing the contract because they create a convention called purpose and then they use purpose, for example, in paragraph 1C. Parties are assisting you for the purpose. Yes, Your Honor. The purpose being to see if they can find a commercial relationship. That's right. As opposed to from your adversary's view, the purpose would have been for the Coca-Cola company to protect its information. That's right. We're talking purpose. Is there any place else? Well, in 2A, we also see the purpose cited again. It's 2A and then it's throughout. It appears in 2C as well, only using the confidential information. And the confidential information is the Coca-Cola. I'm not trying to help you here, sir. But I mean, as you will notice, I am helping you. The task for the court is to come to the correct, and we believe true interpretation of what the NDA is. Yes. And then there is, I should also say for completeness, apart from the purpose, Paragraph 6 also states that the agreement is not a grant of any right or a license under any intellectual property rights of any of the parties. And then Paragraph 12 talks about some of the provisions that we just discussed, including Paragraph 7 on payment and Paragraph 10 on being the entire agreement of the parties, you know, will survive the termination of this agreement indefinitely. So this, taken as a whole, this document covers what happened when Ethox said to the Coca-Cola company, here is a molecule that probably won't work, probably a reason it will not work. If I may, I don't know if Your Honors have any other questions about the agreements and the preemption. I'll say briefly on the preemption issue, we believe that the Tavery v. NTP case with respect to the part of the damages request that is looking for forward-looking royalties is on point. Essentially, Ethox is attempting to circumvent the statute that says there is no accounting for joint inventors, even if, and I'll get to the inventorship question in a second, but even if, assuming hypothetically, Dr. Tanner were entitled to be named as a co-inventor, there is no dispute that the Coca-Cola inventors are properly named as co-inventors on that patent and there should be no accounting or attempt to restrict the Coca-Cola company from freely exercising the patent. With respect to inventorship, very briefly, the issue that we have is that the district court applied a standard looking at the conception of chemical compounds. Is the compound, have you disclosed the compound, have you disclosed the method of making it? What Ethox has now claimed- Isn't the truth of the matter on the issue that you all disagreed with what the legal standard was for purposes of this, that your adversary was arguing in essence for the more rigorous standard, the compound standard, and you were arguing for a product standard, which was odd, but it was true. But then we find fact findings made by the district court that cover both bases. And it seemed to me that the problem with your argument is, oh, we should have used the product standard, which the test would be whether or not there was a significant contribution to conception and the district court has findings of facts where they say, they reference the substantial contribution test at page 20 of the decision, and they decide the issue. So it looked to me like the magistrate judge, I believe it was- Magistrate judge, yes, your honor. It was tried before- Magistrate judge looking at the situation, these parties can't agree on what the conception standard is, so guess what? I'll decide it on both standards, and I'll decide it in favor of Dr. Tanner on both standards. And that's what he did. I believe that's- You not only have to convince us that it was the wrong standard, but you'd have to convince us that the fact findings on the substantial contribution test work can arise. Under the correct standard, we believe there is no evidence to support conception of that which was not in the prior art. The compound- So there's no evidence to support the judge's fact finding? The corroboration. The corroboration requirement, there is no evidence to support the corroboration requirement under the correct standard. And just very briefly, running down- The notebook entries? I'm sorry? His notebook entries? All he's talking about is he made a substantial contribution to using PEM for a particular purpose, not that he invented PEM. PEM is a useful compound for purposes of helping to prevent the release of gas through the plastic. Dr. Tanner. I'm sorry, Your Honor, were you finished? And he says, this is what I'm looking for. This is the substance, the compound I found, PEM. I have my notebooks. I've showed you how to make this stuff. And I'm the one that is saying, I think we ought to give PEM a try. And so the district court said, well, he doesn't have to have conceived the whole thing. He has to make a substantial contribution to conception. And says he's the one that plucked PEM off the shelf. That's a contribution because nobody else did it. And then he went in the lab and played with the stuff and figured out how he could make it and entered it in his notebooks. His notebooks are corroborative, right? His notebooks are corroborative of the molecule and the method of making it. Under the Eli Lilly case, that is not an inventive contribution because that material was in the prior art, and that's undisputed. The material was in the prior art, but the use of it for this purpose was not known. Your geniuses down in Atlanta couldn't come up with this. And so the whole notion that one of ordinary skill in the art was, I mean, Dr. Tanner was like a bozo if anybody could have done this. That's not so. The record doesn't show that. And the finding of fact supports what I'm saying. Your Honor, with respect to what Ethox is now claiming they invented, this is not what happened at the outset of the case. The invention report was simply the molecule and the method of making in the prior art. They overshot. They said, you know, we invented PAM. Well, fine. That's not true, apparently. But they were the ones that, you know, how many million molecules were there out there that fit within your category and that your people had come up with five, not including PAM? And Dr. Tanner, for one reason, goes into the inventory where they keep this stuff and says, hmm, give this one a try. There was a preexisting Formula 2 genus claim that covered this compound before Coca-Cola ever met with Dr. Tanner. There are no unexpected results alleged to have come out as a result of this. And the law says that the species isn't obvious in the light of the disclosure of the genus. And there's no corroboration for the gas barrier additive. I know you're running up against your time. Thank you, Your Honor. And I will just finish this and reserve my two minutes for rebuttal, if I may. There is Dr. Tanner admitted on cross-examination that everything with respect to the gas barrier additive function of that he got from the Coca-Cola company, his patent application copied with respect to that portion of the evidence, everything that was in the Coca-Cola company's prior patent application. He did not contribute that. Thank you, Your Honor. Your Honor, very briefly. Mr. Hersh, you do agree that the molecule was known in the prior art? Absolutely. We've conceded that that was part of the trial evidence that was before the judge, and the judge found that. And that, getting back to the preemption argument, that was the mistake. We had informed the judge at the time, that's not the appropriate thing to look at. It's the molecule as a gas barrier additive. And I think there's ample proof. The judge did a magnificent fact-finding, very thorough, starting at page 20 of the appendix and going through, where he looked through each and every one of these elements, and he found that there was collaboration, that there was conception, that there was corroboration, that there was claims. Claim 11 goes directly to the inventions that Dr. Tanner brought forward to the joint invention group. And the fact is that Coca-Cola didn't do it. 18.5 billion molecules. Sorry, Your Honor. Is the invention here a chemical invention, or is it a bottle product? It's a chemical invention, I think. I only thought that because you strapped yourself with a higher burden in the district court. And I think we've talked about this time and again. I think the answer is we wanted to meet that higher burden, because we believe that if you're taking chemicals and putting them together to form something eventually, you have to understand how those work. And I think that's what Dr. Tanner brought to this. And what's interesting about Dr. Tanner, he didn't... It's an interesting question. Probably the most interesting question in the case to me is, which standard do you use in a circumstance where you have a product that's made up of compounds? And I think... Do you have a case that tells us which way we go on this one? I think when we look at what standard we're using for inventorship, you're looking at just a general inventorship standard. I mean, in order to have conception... But you're not claiming... You're not actually claiming PEM, which is what we're talking about here. That's right, Your Honor. I'm not claiming PEM. You can't claim PEM because PEM belongs to somebody else. So PEM is like it's just something on the shelf that belongs to the world. And you're going to stick it in a... You're going to put some PEM in your bottle. That's correct. Now, does that make this a compound? Or does it make it a bottle? It treads the line, I would say, Your Honor. I really think it does tread the line. I'm asking you, do you know a case that tells me... How does... Clevenger is not very bright about this. How does he know which one of the tests to use where I have a product that's got a compound in it, but it's not claiming the compound? I can't think of a case that actually explicitly does that. I can think of cases that say this is a chemical compound. We have conception in this level. Now, would you agree... You heard my characterization earlier. It looked to me like the magistrate judge realized that he had this problem. He didn't know which standard to apply, so he decided the case based on both. And we went before the judge with the higher standard, with the idea that we would make the proofs to that, and we did. So I think in this case, we've got that higher standard proof. Well, if I disagree with your adversary, if I disagree with your good adversary, Coca-Cola, and say, well, I think there is substantial evidence to support and better ship on the test that he would apply, then we don't need, in this case, to decide the authority issue as to which standard is the correct one. You can win on either one. I think I can win on either one. I think we've presented evidence, and I think the district court found that, and so we've got a situation... In theory, the courts are only supposed to do what they have to do to decide cases, and if you have a... In this particular case, it may be that it doesn't really matter which standard was used. And in some other cases, it may make a lot of difference what standard applies. So maybe I wait until that case to decide the tricky issue. But I think that the answer here is that when you have the significant contribution that Dr. Tanner had to Claim 11, to what is claimed in the 265 patent, you're going to find, A, he's an inventor, and that's really the important thing, whether or not he is an inventor here. And I think when you go through the issues of that, you kind of understand that he has done all the things necessary. And with that on inventorship, the one thing I would point out in reply with respect to the nondisclosure agreements is Coke was a drafter of these agreements. They call them nondisclosure agreements. It had one subject matter. That was the confidential information. The provisions that were cited, the no-pay provision of this, there is no obligation to pay, and I could read the language back into the record, but that really relates to, I don't have to pay you for showing me information. You don't have to pay me for seeing and holding the information. That's it. That's how contextually those provisions read. And the subject matter that is pointed to in the merger clause is just that. The subject matter is Coke's confidential information in this nondisclosure agreement. Remember from, I think it was torts, when we were back in law school and they talked about the trap for the unwary? Yes. There's such a thing. It's ancient in law tech. Your client entered a trap for the unwary. You sign a contract that says no money is going to change hands under this contract? That's true. This is a nondisclosure agreement, like a material transfer agreement, and there are a lot of these things. You knew right away that, assuming that Dr. Tanner charged by the hour, the way good lawyers do, the time value of what he was doing, that whatever he was doing, the company wasn't going to get any reimbursement from Coke. Doing the BPO1 work, the lead-up work? Sure. That's true. They say no money. This is absolutely airtight. No money is being transferred from the Coca-Cola company to you, period. Well, but that's not the context of what the agreement is. That's the context of what happened between the parties. I'm just saying, even for the time it would take to read the information they gave you, the value of the time, and maybe their information is hard to understand, and so maybe you even had to hire a lawyer to come in and look at what they gave you. You knew you weren't going to get any money back from that because any money expended in connection with protecting their information, you would have to admit you wouldn't get. And what we're seeking here is unjust enrichment. I'm just saying, this is like walking into a bear trap. It could be considered that way. I would say that what they're doing is trying to work collaboratively with Coca-Cola and confidentially with Coca-Cola to get to an end result, and the fact is unjust enrichment related to that which was not part of the contract and dealt with the activities that Coca-Cola decided to undertake to covertly take the PEM molecule and the testing. Your problem on the unjust enrichment is that the cases that favor you are all bad guy cases. There are cases like with your bilateral contract, the second year, where you clearly got some rights. Their whole argument is we didn't steal from you because you gave us what we took. So that distinguishes you from the body of law that has said, oh, there's no preemption problem when what you're simply trying to do is to vindicate your rights as someone from whom things were stolen. And I would say, Your Honor, that when we look at this, we're looking at kind of Moleculon and looking at Xerox, with the idea that there's a belief that the parties are in this confidential relationship, that there's nothing that's going to happen to disturb that, and that this is a confidentiality. And with that, we think that with respect to the NDAs and the preemption, the judge committed legal error, and the judge should be reversed on that, partially with the finding that there is an error on finding that PEM was in the prior art. And with respect to inventorship, we believe that the judge got it absolutely right, that Dr. Tanner is an inventor of the 265 patent, and so should be named as the district court had determined. Thank you, Your Honor. Mr. Gerretsen, four and a half minutes. Thank you, Your Honor. I wanted to briefly address the question that you raised, Judge Clevenger, with respect to what is the invention here. This is not a compound patent. Claim 11 of the 265 patent, which is the only claim that Dr. Tanner asserts that he is a co-inventor of, incorporates Claim 1 because it's dependent from that claim. And there are a number of elements to that. There's a container that has a polyester, a creep control agent, a gas barrier-enhancing additive that has a particular proportion of the creep control agent, and it also, at the very end, says we're in the- I'll ask you the same question about the body of our precedent. Yes. Are you aware of a case that has presented this precise question, which is- With respect- If you take clearly a product claim that is chock full of compounds, so to speak, which way do you go for the standard? And by the way, what's your secret ingredient? I'm not at liberty to disclose that, Your Honor, even if I knew, which I don't. They keep it in the vault. I believe- I am not aware of a case that is a chemical compound case that is directly on point, but I believe that the Nartron case is on point and is not limited only to non-chemical inventions. In that case, there was an adjuster for a lumbar support extender that was provided as the sole allegedly new element of a dependent claim to the named inventors, and there was no- And the setting we have here is that you've got- I mean, Dr. Tanner was clearly- He wasn't- He was a million miles away from the Coke bottle, the plastic bottle. He was in the laboratory playing with compounds, and that's what he's doing. And he's looking at the compound, and although the compound isn't actually claimed as such, it is the key ingredient in at least one of the claim in suit. And so what's the foul? Why would we assume that we have to decide this issue, which I personally don't think we have to because I think we can elide it, but assume we had to. What's wrong with saying we're going to treat this class of cases as compound cases for the inventorship test? It produces a higher test. It's a harder test to meet than the product test. So that's a good idea, right? We want to have strict tests. So what would be wrong with disagreeing with you here as a matter of law, and why would you in a law school classroom argue that we'd make a mistake by taking the higher standard? Because I think that the principle that is kind of applied in NARTRON about whether or not somebody made a significant contribution to the invention is something that does need to be assessed on a case-by-case basis. I don't know that this is a good case for a bright-line chemical compound patent rule because there are... A significant contribution, recognizing that it doesn't require the complete conception of the whole gamish, is so much a lower standard than the notion that you have to be, you know, have fully aware of the compound in your mind and the rest for the other tests. You're not going to argue that the test you're asserting is a less rigid test, are you? No, I think part of the disconnect is what is the invention here? They are claiming that they came up with this as a gas barrier additive. Their invention disclosure only supports that they came up with the compound and a method of making it. And so when you look at whether or not their contribution of... The only thing that they can substantiate that they actually provided... You're talking about their invention? No, what I'm talking about is what they can substantiate with corroboration that they came up with, which is the molecule and the method of making it, which were in the prior art and are under the Formula 2 pre-existing claim of Coca-Cola's Claim 1 in the prior application. And so that their contribution, the only contribution that there's evidence of that they made was the compound and the method of making it, which was in the prior... No, but for this model, for this... Coca-Cola called up and said, we have a very specific purpose in mind. Our scientists are probably the best in the whole world, haven't been able to figure it out. So we're outsourcing this problem, scientific problem. And presumably the folks at Coke knew about PAM, right? Because it was in the prior art. They had never came to their mind that PAM would be useful. Why, my goodness, if they knew that PAM would be useful, they never would have come to these other people. So it's the specific use of PAM for a specific targeted purpose. It's what I think they're saying Tanner came up with. And our position is that there is no evidence in the record that corroborates that that is what he came up with. He came up with the molecule, he came up with the method of making it. It is the Coca-Cola company that came up with those, with that use. And the record is clear. Thank you, Your Honors. Appreciate it. Thank you, Counsel. Matter stands submitted.